The Supreme Court's 2024 decision in quarter post to the Board of Governors of the Federal Reserves makes the answer clear. Claim accrues when the plaintiff is actually injured, not when the government acts. Here the Court of Federal Claims dismissed our case as untimely by pegging accrual to a 1985 stated agency designation. Quarter post invalidates that reasoning. The exchange program here is optional, right? The exchange program is optional, Your Honor. So how can something that's optional delay the running of the statute of limitations? So the issue is that the date that the lower court pegged the accrual to was Bloomingdale Valley 4 determination, which was an action by the State of Wyoming. It was not when there was cognizable injury by the plaintiff. The Wyoming... I don't think you're addressing my question. How can something which is optional delay the running of the statute of limitations? How can that be a necessary part of your cause of action? The exchange mechanism is the mechanism that is in the Service Mining Control Reclamation Act. It was the remedy that our client was asking for pursuant to the ABF determination. There's no other remedy that we see under the statute and we don't... Let me make your argument a little more streamlined so we can make sure I understand it. Is your argument in response to Judge Dyke that the Constitution requires taking without just compensation and we, maybe there was a taking earlier, but we were still under the belief that we were going to receive just compensation and it wasn't until we didn't that we had a cognizable act. Do we have to agree with you that your claim does not... And I'm not going to say starts running because there's a difference between claim accrual and the statute of limitations and our case also made that clear. But is your argument that the statute of limitations didn't start ticking for you until you knew both that there was a taking and that the taking was not going to be justly compensated? Is that what we have to agree with in order to find for your client? That is correct, Your Honor. We believe that the date where the injury became cognizable was August 2017 when our client was told that the value of their 138 million tons of coal was... What about the October... Yeah, you're going to say the same thing I'm going to say, so go for it. Yeah, I think we're going to say the same thing. But what about the October 4th, 2016 date? Weren't you at least aware by then that there would be the $0 valuation? Yeah, so with regard to the August 2016 claim, Your Honor... No, October... October, excuse me, October 2016, excuse me, Your Honor. Our position is that that was not a final determination. There were negotiations and discussions that went on subsequent to that. Yeah, but that has something to do with notice. First off, you didn't even put the October 2016 letter in the record. It's not even in here, so we don't have it. But what we do have is your complaint, and this is a 12B case, so that's what we use to understand all the facts in the record. And your 12B complaint expressly says that your client received a zero valuation in October of 2016 from the board, agency, whatever it is that gave it to you. So the clock starts ticking. You knew as of October of 2016, the government was saying, you're not getting any compensation. You're getting zero. Yes, so our position is that that October 2016 letter was not a determination, that it was actually zero because there were negotiations... That may be your position now, but I look at this under the rubric of your complaint. Your complaint doesn't say that. Your complaint says we were notified in October 2016. You're trying to supplement the record right now with attorney argument. Irrelevant to me. What I have to decide is based on the complaint, and your complaint makes an assertion. We were told officially, we were informed in October of 2016, zero dollars. It doesn't say, but not final, still under negotiation, all that other stuff. This is all just attorney argument. I don't decide based on that. I decide based on your complaint and the allegations therein. So why is Judge Cunningham's point not the exactly correct one? You alleged that in October of 2016, you were clearly and definitively put on notice. Yeah, perhaps the complaint could have been better worded, Your Honor. The reason we included the 2017 letter and not the 2016... Well, because the reason we included 2017, because you're not out of the statute of limitations. If you included 2016, you would be in trouble. That's outside your time period. And it's the government's position that it was the 2016 letter. The government didn't provide that letter either when it made the claim that it was 2016. Well, they don't have to, because they got your complaint. They don't have to provide the letter, because your complaint states that on its face. Again, Your Honor, I think the complaint perhaps was not as clearly worded as should our position is that the valuation, the $0 valuation became final in August 2017. Well, should we look at the complaint? Why don't we just pull it on out? Sure. Okay, let's do it.   Appendix page 20, paragraph 41. I feel like I'm seeing some language that seems pretty clear to me that says value $0. I mean... Well, even more, it says BLM formally rejected CMP valuations. Right. The issue there, though, Your Honors, is that it was only subsequent to August 2016 that our clients found out about the assumptions that were underlying that $0 valuation. And so the... I think you meant August 2017, right? Because... August 2017. Your argument. I'm not saying I'm agreeing with you, but I'm... No, I apologize that we did not know the underlying assumptions behind that $0 valuation. Who cares? How does that have any impact? You were, according to your language, formally rejected and received a $0 valuation. You're on notice. Who cares if you don't understand what valuations or numbers or logic or considerations went into the determination? The determination was made. You were put on notice. The federal government thought it was worth $0. Tick, tick, tick, tick, tick, tick, tick, statute of limitations. Yeah, again, the position that we're taking, I appreciate all of that, Your Honors. I think the position, as we see it, is that that was not final until August 2017, where the government essentially rejected different exchange parcels that were... Do you have any case law to support up your argument that really August 2017 needs to be the right date? It seems to me that you're making some argument that we should ignore this October 2016 date because of the lack of finality. What's your support for that? So, the argument would be that it was only in August 2017 that there was a cognizable injury under the framework in Corner Post. Now, I want to back it up because, I mean, the 2016 thing seems to be a problem for you, but Judge Tank asked a couple of questions and I don't really feel like we flushed them out. So, let's just talk a little bit about the facts. So, Congress passes a law in, was it 1985? The initial law, Your Honor, was 1977. 1977. The SMCRA. The SMCRA. SMCRA. And what that law said is certain people with certain types of land would not be allowed to mine the coal on their own land. Was it for environmental reasons? Exactly correct, Your Honor. Exactly right. But at that point when they passed that statute, who knows which land it is, right? Like your clients, the Hall family probably didn't necessarily know that that statute impacted them. Is that correct? That is correct, Your Honor. So, but they learned that in 1985 that it did when the WDEQ determined that there was an alluvial floor issue here that you couldn't mine, right? That is correct, Your Honor. So, at that point you could have sued for a taking, right? Well, there are... Yes, no? I would say no, Your Honor, because at that point, at that point there was no cognizable injury. The State of Wyoming had delineated as, I guess, a geological exercise the scope of the alluvial valley floor. That seems to be inconsistent with the Supreme Court decision in Nick, which seems to say you can sue when there's an injury of that kind, even though the amount of compensation due hasn't been determined. Okay. So, with regard to the Nick case, Your Honor, our reading of it is that the Supreme Court is saying there's no exhaustion of state remedies. Nick doesn't specifically refer to the term accrued, which is what a quarter post discusses subsequently. Nick says you can sue when the injury happens without going through a process to determine what the extent of the compensation is. Well, the other issue there, Your Honor, is who...  The other issue there, Your Honor, is who...  That is correct, Your Honor, but the issue is who our clients would sue. They couldn't sue the State of Wyoming. Wyoming was just effectively in a geological exercise to delineate the scope of the alluvial valley floor. So, all these cases where people sued when they got a determination that they couldn't mine, they were suing prematurely, right? Well, in those cases, Your Honor, like, for example, Nance and Whitney benefits. For example, in the Nance case, the plaintiffs did try to go through the administrative process of the exchange before suing. One of the issues there, Your Honor, is who would the client sue? So, for example, by analogy to the GNP case, if the plaintiff had sued the State of Wyoming, the State of Wyoming would say, this has nothing to do with us, we're just delineating the alluvial valley floor that we are then going to certify to the Secretary of Interior for an exchange. If the plaintiff were to have sued the federal government, the federal government would have taken the exact positions taken in the GNP case to say, it has nothing to do with us, it has to do with the State of Wyoming. That's a different issue then. That's the great northern issue as to whether it's the U.S. or the state. But in terms of the final determination that you can't mine, that was made in 1985, over, and the Supreme Court said you can't sue in that case. Well, the other issue with the 1985 determination, Your Honor, is the federal government itself didn't accept that alluvial valley floor determination and our client had to engage in litigation and it was not until 2014 when the federal government accepted that alluvial floor determination and in their briefs the government tries to shrug that off in a footnote and say, oh, that was just a temporary position we took. But even the federal government didn't believe that that was a final... And if the federal government didn't believe that your clients were properly classified as having property within the ADF, they would not therefore have to compensate under the SMCRA. Is that correct? That is correct, but then our client was... So that was resolvable to mine. To mine in that land if it's not... I'm sorry, can you try one more time? Oh, yes, Your Honor. If it was determined not to be in an alluvial valley floor, then the argument would have been that our client could have mined on that land. The reason our client can't mine on the land is because of the determination that it's an alluvial valley floor. I think what we see... Which was resolved in 2014. It was resolved in 2014. The other thing I just want to... So you could sue in 2014 because you couldn't mine. Well, the whole premise behind that litigation was that the government was going to do an exchange. So the whole point and the reason why our clients went through that litigation was to do the exchange. What we've seen in the cases... This is out of curiosity. I don't understand this. When they do an exchange, so if the government says, you've got property and we're not going to let you mine the mineral rights, which are yours under, and in this case it was what, like 150 million? 138 million tons, Your Honor. 138 million tons of coal. Correct. So the government says, you can't mine your 138 tons of coal because we've decided if we let you do that, it would have a negative impact on the environment. So what is the government supposed to do by way of compensation? So what the government is supposed to do by way of compensation is, after the Alluvial Valley floor determination, propose an exchange to the plaintiffs of comparably valued land to do an exchange. So I have a dumb question. I really don't know what this means. Does this mean they give you different land if they go mine this other land, or do they just give you the dollar value of what the coal would have been had you been able to mine it? Excellent question, Your Honor. So what they are supposed to do is give another parcel of land. There have been cases where the government has unilaterally decided to pay instead of give the other parcel of land, but the way the provision is structured— And where does this other land come from? They're like, oh, here, go mine the national park. I don't understand. No, no, that's an excellent question. So it would be a tract of federal land that would be mineable, and the history of these exchanges, unfortunately, is that very, very few of them have actually been carried out. So if they don't give you a parcel of land that you could, in fact, mine to get your 138 million tons of coal, so it's not right? That's exactly right, Your Honor. If they don't do that, they're supposed to pay you for what the value of that would have been. Now, it's fair for them to minus from the value the expense you would have incurred in mining it, right? Correct. I don't understand how they came up with zero in this case. Like, you have 138 million tons of coal, but it's worth zero? This is exactly our contention, Your Honor. Going back to Judge Cunningham's question, that's why our client doesn't give the total. Is it because it was just a tour of the center of the world, like a journey to the center of the earth, and that's the only way you could have gotten it? What is the government's reasoning for why it's worth zero? Our understanding is that they used different assumptions that were not assumptions that were per their regulations, and we only found out about that after October 2016. So what avenue for redress do you have for that? Is that an APA challenge? That's what I'm wondering. There has to be some way for you to challenge it, and if it's not in this case, I want consolation in my own brain that there is some other mechanism by which you could challenge that action. There is an APA claim ongoing, Your Honor, in the federal district court in Wyoming and also in the district court in the District of Columbia with regard to now the phases to do evaluation of the land. The issue is that that would be perspective relief. It would not take into account the harm that we allege our client has suffered from all of the delays and the difficulties that the government has created for our client. All right. I think we better hear from the government. Let's give Mr. Herman a chance. Thank you, Your Honors. Good morning, Your Honors. Brian Herman for the United States. May it please the Court. Before we jump into the time bar, and trust me, we will, would you address the stuff we were just addressing here at the end, which is how could the government come up with zero? Like how can they have 138 million tons of coal that they actually leased to Exxon? I hope I didn't say anything confidential. They actually leased to Exxon, and Exxon was intending to mine until this law was passed. It said, nope, you can't mine this. How can the U.S. government have turned around and looked at that same thing and said, yeah, well, worth zero? I mean, Exxon didn't think it was worth zero. So, Your Honor, the shortest answer, as I understand it, is that the cost of coal in the market versus the cost of mining it and getting it to market given where the mine is located is the reason for the $0 valuation. Okay, but Exxon didn't think it was worth zero. Should I have confidence the U.S. government is better at valuing it than Exxon? I mean, Exxon's got a whole board. They're responsible to somebody. They thought it was worth something. They came in, and they were willing to pay this family for the right to mine the coal on their land. So how could those two things coexist? Exxon, a private company that I don't think is generally run by stupid people, decided it was worth something. And then the U.S. government comes in and says, shh, Exxon. I don't know what they're talking about. 138 million tons of coal isn't worth anything at all. Your Honor, Exxon thought so, but then it walked away. It did not pursue the exchange because of the values involved. But I want to express something important in that. That valuation is not necessary to this case. As my colleague mentioned, there are two district court litigations over the valuation. There is also a citizen's commission. Over the valuation of this property? Over the valuation of this property, Your Honor. And there are actually seven settlements. And so what is the relief that's sought in that case? The parties are pursuing a reevaluation of the coal lands. So, in other words, they're arguing that there should be a permissible exchange because the property had value. That's the argument, yes, Your Honor. And it's my understanding that the settlement agreement is that the parties will reevaluate the whole ranch coal to see if an exchange could be affected. Is it true that it would only be prospective relief as opposing counsel indicated in terms of relief sought in that other case? I don't exactly know where he's trying to draw the line. But if an exchange is effectuated, then there's a conveyance of the fee. The Wyoming Trust and its entities would receive the fee in other federally owned coal lands in exchange for the lands subject to the EVF decision here. But as to that EVF decision, Judge Dyke, your earlier questions were correct. 1985 is the pivotal year. How could that be so if the government even disputed or if there was at least an argument raised that the government was not in agreement that a particular tract of land was properly determined? Because when Wyoming—I know you ceded certain authority to Wyoming. I get that. So Wyoming comes along and says this is an EVF tract. Well, that designation would theoretically bind the government to this exchange possibility where the government would have to give federal land or alternatively pay money. So my understanding is even though this determination by the state of Wyoming is this is an EVF piece of property, that the government itself disputed whether that was correct and that that dispute continued because the government didn't want to be liable. They didn't want to have to pay the money or do the exchange. And that dispute continued until 2014. So if that's true, how can you stand here and say to me that it was—it's the government's view that it was definitively resolved in 1985 when the government actually disputed that very fact at least in 2014? Now, you can jump. You can walk away. You could get yourself out of a lot of trouble right now and walk away from 1985 and just say, well, Your Honor, let's just focus on 2014. But if you want to keep defending 1985, please continue to do so because that would make it more fun for these students. Your Honor, I will. But I will start by saying 2014 you're right. Certainly by 2014 the litigation had ended and BLM for its purpose had conceded the EVF decision from Wyoming DEQ in 1985. But why was the government disputing the determination? It's my understanding, Your Honor, that they were disputing the exact acres involved, not the EVF decision itself but how much acres. There's reference in the complaint to about 900-some-odd acres versus 1,600. But that, Your Honor— So the government was arguing that there should be more acreage than had been determined? Less, Your Honor. Less. Yeah, they don't want to pay all the money, so they want it to be less. But, Chief Judge Moore, you're correct that certainly by 2014 whatever dispute was at issue was resolved. BLM agreed with the WDEQ decision and plaintiffs didn't sue until nine years, nine-plus years later. Claim barred. Case over. But 1985 is correct and I want to turn to that. Because we have to think about what is the claim. It's a regulatory takings claim. A regulatory takings claim approves when regulations are applied to restrict an owner's use of a property. That came in 1985. And as plaintiffs themselves point out in their complaint, the Wyoming DEQ is the sole and exclusive decision-maker on this EVF question. By 1985, there was no longer a question how the Wyoming surface mining law applied to the Hall Ranch property. And this is just a hypothetical because I don't know all the specific facts the way you do. But suppose, in fact, Wyoming says 1,600-acre parcel is all EVF land. The government is going to have to pay for this exchange. We're not going to let them mine. And the government comes along and says, no, we're not paying anything. We don't believe a single acre. We don't believe any of the land is EVF land. We don't believe it's subject to any restrictions. And we don't believe we should have to pay for anything. You still think at that point they're on notice, clear notice, that the government has taken their land and that the government has got to pay them just compensation? They are on notice that the party with the authority to control their mining has restricted them from doing so. So Wyoming became a primacy state in 1980. So as of 1980, it's not SNAPRIC that applies. It's Wyoming surface mining law that applies. And its regulatory entity applied its law to Wyoming Trust in 1985. Your Honor, it's hypothetical if that was the case under the citizen supervision. SNAPRIC provides the district courts with jurisdiction to sue. That is a catchy little name for SMCRA. But so you're saying in 1985 they should sue Wyoming for designating their land. And their taking of this case would be against the state, not the government? The state of Wyoming, yes, Your Honor. That's what we held in Great Northern. Correct, Your Honor. In Great Northern there was an allegation that Montana was effectively acting for the federal government. That it was coerced or it's an agent. And this court rejected that because Montana, like Wyoming here, was a primacy state who enacted the law of its own sovereign authority. Do you agree that we have held in cases there's a difference between claim accrual and the statute of limitations? The court has acknowledged there's a difference, but I'm not aware of an application where it is done so. And there's a case, I can't recall it off the top of my head, and it might be actually the court's rail trail jurisprudence. It might even be Caldwell. It is rails to trails, and I wrote it. But in any event, so there is a difference, though, because if you think about it here, do we expect or even want them to run to court when Wyoming made the decision that the federal government has come along? And the federal government is the payee, not Wyoming. Wyoming is not the payee. Wyoming could decide that, like, hundreds of thousands of acres are ABF, and that would bind the government. So the government has to be the ultimate sort of arbiter on what is included in this program and what is not, even though the government delegated to Wyoming the initial authority to designate ABF land. But the government disputed that designation. Do we really want this? If the government disputed that any portion of the land should be considered ABF, we're not paying you a penny. We don't think anything should be ABF. Feel free to mine away. At that point in time, is it going to be reasonable to expect the property holder to run to court, or wouldn't it be reasonable to imagine that they wait for the resolution of this dispute since the federal government says their land is not ABF land or disputes it? No, Your Honor. The federal government is not the payee here, and I want to make clear the exchange mechanism is separate. As Judge Dyk asked earlier, it's an optional path towards compensation, but Wyoming is the exclusive authority in applying Wyoming law. As Wyoming Trust itself states, this is Appendix 14, the ABF determination, quote, is entirely within the state of Wyoming's authority, not BLM's. See, this doesn't make sense to me. So are you saying to me that the SMCRA has passed which says that people for environmental reasons can't mine their home? That's a federal law. That federal law delegates to the states the authority to choose within the states which parcels of land fall within this federal prohibition. Does that sound accurate? No, Your Honor. So it provides for cooperative federalism, and the Great Northern Properties case explores this. The SMCRA is not delegating any federal authority. SMCRA says that if a state wishes to regulate surface mining in its borders, it can apply for its program to the Secretary of the Interior, and that the Secretary of the Interior can approve it if it meets certain minimum thresholds. The Secretary of the Interior did so here for Wyoming in 1980, and it's at that point that SMCRA chops out. It's the WEQA, I believe it is, the Wyoming Surface Mining Law, that then applies. So from 1980 onward, it's using Wyoming law, its sovereign authority, to determine who can mine in the state. And here, its regulatory agency did that in 1985. I'm confused about what the litigation was. Was the litigation by the federal government challenging that 1985 determination by Wyoming? No, Your Honor. I believe Wyoming trusts with the United States because BEOM was not willing to engage in the exchange that it sought based on the WDEQ decision. But I'm not overly familiar with the 2010. I'm sorry. It wasn't a challenge to the 1985 determination? It was a challenge. I think, I could be wrong, I think it was a challenge to the 1985 determination by the government because the government has this voluntary on the property rights holder's part, but not voluntary on the government exchange program. And the government did not want to be bound to have to participate in this exchange over this ginormous parcel of land with 138 million tons of coal. That's what I think happened. I could be wrong. So, Your Honor, regardless what BEOM may have done. Sorry, go ahead. Regardless of the BEOM's view of the WDEQ decision in 1985, the BLM, as Wyoming Trust itself says in its case, is not the decider. Wyoming DEQ issued the only restriction on Wyoming Trust property in 1985. In any event, that was resolved by 2014. Absolutely. At that point, it was clear they couldn't mine it, and their only potential remedy was to seek the exchange, correct? Or sue in the Court of Federal Claims if the 2014 date was correct. Well, so in this case, by 2014, it was resolved. But what about the compensation piece? I mean, can you bring a claim for takings without knowing you're not going to receive just compensation? What I mean by that is, like, if the government says, I'm going to take your land and I'm going to pay you millions of dollars for it, then you've been compensated. They don't really have a cause of action. If they compensate you before taking it, you don't have a cause of action. But Nick makes clear that if you take the property without having paid them, you have your cause of action, and your takings claim occurs then, regardless of post-deprivation remedies. But what about exhaustion? Now, we say you could take it without compensating them. The government enacted this BLM program. The program, property rights holders could opt in. The theory behind that program is it would justly compensate them for what was taken. So we have a scenario here where, at the time their land was taken, they were informed by both Wyoming and the federal government that there existed a program under which they were going to be compensated. So why doesn't this fall into that selection of cases that says a taking with compensation is not right, but a taking without compensation is right? Why doesn't this fall into the it was fair for them to delay in filing suit until they knew that the program the government promised would compensate them wasn't actually going to? Why isn't it fair that this falls into that other section? I think I'm right in saying there's a delineation of cases, right? If the government compensates you when they take, no problem. Why isn't this a scenario where the government is pledging to compensate you when they take? They've got a program, in fact, that will do so, and they weren't aware of a conflict until they realized the compensation wasn't adequate because it was zero. Because the government's not pledging to do so, and this court rejected that exact argument 40 years ago, but three months after the Wyoming DEQ made its decision in this very case, and I'm referring to the 1985 Whitney Benefits decision. This court held, quote, that pursuit of an exchange transaction must occur and be unsuccessful before a taking can occur is a misconstruction of the governing statute. The exchange remedy is optional at the choice of the plaintiff, but they also have the chance to sue. The holding of Whitney Benefits that a claim… But isn't this one of those cases where this distinction between claim accrual and statute of limitations maybe would be at its apex, and you have a promise by the government to compensate that then goes unfulfilled? And isn't it fair for a property rights holder to trust that the government will justly compensate them and only when they realize they're not going to be to then bring suit? No, Your Honor. First off, it's not a promise to compensate. It's a land exchange. And as this court made clear in… What's the point of a land exchange? You have to actually exchange land with them that gives them the exact number of whatever tons of coal they had. It's not by tons of coal, Your Honor. It's based on Fulham's equal value, and so it's about the value at issue. Yes, fair enough. It's about coal taking into account the difficulty of extraction, and there's an amount of dollar value assessed to that, and then we're going to give you a piece of land that allows you to extract coal and end up with the same dollar value. It's still compensation. Your Honor, what I'd point to in my dwindling time here is, again, this court's holding… There's no provision in the statute for payment of money, right? It's only an exchange program for other coal lands. That is correct, Your Honor. One of the reasons in Whitney Benefits this court held that it was an optional path was because it questioned the constitutionality of forcing you to take land instead of money under the Fifth Amendment. And so I just about close by pointing the court to 1558, where it says, We hold, therefore, that the pursuit of a substitution or exchange transaction under Section 1260b-5 is not a mandatory remedy but is optional with the landowner who retains also the option of suing the claims court for money without such pursuit. You can't do that. You can't sue in the claims court if you don't have a right claim, a claim that has accrued. Okay. Before you sit down or anything like that, I want to just circle back on a couple things and just kind of sum it all up. It sounds like you're definitely arguing that you think accrual begins in 1985, but we've also talked about a series of other dates. It sounds like you're open possibly to at least 2014 as the latest, and whether we're looking at 2014 or 1985, you can also discuss 2016. All of that would still lead to a situation where there would be a time of our claim. Is that fundamentally your argument?   Well, building on Judge Cunningham, we never gave you a chance to address 2016. Tell us why, because a lot of sympathy here for this one. Why would 2016 be a date that would time bar them? What do we have in front of us that would suggest that they for sure knew about the rights of 2016? Your Honor, let me preface that by my answer is that this is all based upon plaintiff's argument that compensation is required. We disagree with that. But if that's true, if that's the framework we're looking at, then I would point certainly to Appendix 20, which is Paragraph 41 that Your Honor has read earlier, because it's not just some open question. The plaintiffs themselves write, BLM formally rejected their own valuation, and that the DME, the BLM office, found that the Hull Branch Coal has a value of $0. That put them on notice, and you can look for that to Appendix 24, which is Paragraph 48, when they describe the letter their own attorney wrote back to BLM, complaining about some things, including, quote, DME's assumptions. The Wyoming Trust knew in 2016 that they had a $0 valuation. That certainly was the very last point in time at which there was any question, even under their own theory, and August 2017 doesn't clarify that. If you look at Paragraph 62, this is Appendix 29, the August 2017 discussion talks about rejecting a particular track and proposing others. That's not any formal valuation of $0. It's an ongoing discussion in light of the existing 2016 valuation. Thank you. Thank you, counsel. Do you have some rebuttal time? Yes. Thank you. Make it three minutes. We went over with the government. Thank you. Thank you, Your Honors. I'll be brief. I just wanted to point out just a few things. First of all, the difference between the 1985 date and a possible date that begins after 2010, we would argue, is very significant. Even in the lower court opinion, which was not favorable to appellants, the judge did draw a distinction between the behavior that we documented that the government carried out beginning in 2010. If the court were to consider a date that starts after 2010, we would argue it's very different from 1985. Second point, I just wanted to… Do you agree that you could sue in 2014 at the latest? In 2014, Your Honor, the claim had not accrued, and it was still unclear who… You're not answering my question. Could you have sued for a taking in 2014? Sued whom, Your Honor? Wyoming or the federal government? The U.S. government. In terms of the statute of limitations, you could have sued in 2014, correct? Well, the challenge, Your Honor, is 2014, if that was the finality… Please answer my question. Could you have sued in 2014? We could have sued, Your Honor. I think the government would have responded as they did in GNP. Go sue Wyoming. And so our client would be stuck in this endless, vicious loop. But, yes, they could have, and I think the government would have taken the position it took in GNP. The other point I just wanted to make, Your Honor, is with regard to the Whitney benefits. We've looked at Whitney benefits very, very carefully, and the Ruxell House case, upon which I think Whitney benefits at least substantially relies. And looking back at the Ruxell House case, I think there is an argument that would say, well, maybe there should be an exhaustion requirement in terms of whether the exchange is successful or not before embarking on suing for monetary damages, given, as you pointed out, Judge Dyke, that the only remedy that is in the statute is for foreign exchange. And then just the last point, Your Honor, is just a more general point, which is the jurisdictional grant and the statute of limitations, I think increasingly in the United States Supreme Court with cases like Wong and Harrow, I think there's a tension in treating a statute of limitations as a clear jurisdictional bar. I think especially in this case where our clients essentially have been given the runaround for decades by the federal government. All right. I thank both counsel. This case is taken under submission.